# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LYONS INSURANCE AGENCY INC., a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2017-0092-SG |
| HOWARD WILSON and GMG INSURANCE AGENCY, a Pennsylvania Limited Liability Company, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## **<u>MEMORANDUM OPINION</u>**

Date Submitted: January 14, 2021
Date Decided: April 29, 2021

Michael P. Kelly, Andrew S. Dupre, and Janine L. Faben, of MCCARTER & ENGLISH, LLP, Wilmington, Delaware, *Attorneys for Plaintiff.*

Blake Bennett and Dean R. Roland, of COOCH & TAYLOR PA, Wilmington, Delaware, *Attorneys for Defendant Howard Wilson.*

Lawrence V. Cronin, of SMITH KATZENSTEIN & JENKINS LLP, Wilmington, Delaware, *Attorneys for Defendant GMG Insurance Agency*.

GLASSCOCK, Vice Chancellor

In reference to an underpowered steamboat with a big whistle, a nineteenth-century waterman supposedly said that she could go, or she could blow, but she could not go *and* blow.  The vessel had marginally enough steam to make way, but when steam was diverted to blow the whistle, she went dead in the water.

The Defendants' case in the damages phase of this litigation, described in this post-trial Memorandum Opinion, is like that steamboat.

The case involves a non-compete in the employment contract of defendant Howard Wilson, an insurance broker, with his employer, plaintiff Lyons Insurance Agency, Inc. ("Lyons").[1]  That contract protected Lyons' rights to Wilson's "Book of Business"—his list of clients with whom he had relations.  Lyons in turn had hired Wilson from another brokerage, non-party USI Insurance Services ("USI").  Lyons spent two years litigating over a non-compete in that relationship, which it finally settled by buying Wilson's Book of Business from USI for more than half a million dollars.  Wilson then promptly quit Lyons and decamped for a competitor, Defendant GMG Insurance Agency ("GMG"), where, per Lyons, he began servicing parts of the Book of Business on GMG's behalf.  I first heard Lyons' request for preliminary injunction.  I declined to enjoin Wilson's work for GMG, based on the existence of a buy-out provision in his employment agreement, which I found operated as a

---

[1] *See generally Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606 (Del. Ch. Sept. 28, 2018) [hereinafter *Lyons I*].

liquidated damages clause to vitiate the likelihood of irreparable harm.[2]  At the preliminary injunction hearing, Wilson testified that he had no choice but to follow his most valuable clients to GMG because, despite his best efforts, he couldn't entice them to join him at Lyons.[3]  The parties then entered discovery and moved for summary judgment.  I found, via Memorandum Opinion of September 28, 2018, that Wilson had broken the employment agreement when he went to work at GMG.[4]  I also held that GMG had potential liability for tortious interference with that contract.[5]  The Defendants maintained throughout that they had not intended to purloin business from Lyons, and contested damages.  I entered partial summary judgment in favor of Lyons and directed the parties to prepare for a damages hearing.

The Defendants appeared to be making way towards a defense of the damages phase of the action, in part because of the idiosyncratic liquidated damages provision in the employment agreement, and the rather convoluted progress of the Book of Business, which had been subject to an injunction during the Wilson/USI litigation. When it came time to sound off at trial, however, the Defendants' case lost all momentum.  Wilson submitted an affidavit shortly before the hearing recanting his prior testimony as perjurious; he admitted that he had plotted with GMG principals

---

[2] *See* Telephonic Rulings on Pl.'s Mot. for Prelim. Inj. 12:2–13:16.
[3] *See, e.g.*, Tr. of Oral Arg. on Pl.'s Mot. for Prelim. Inj. 125:20–129:14, 132:18–136:6, Dkt. No. 81.
[4] *See Lyons I* at *6–*8.  A more abundant recitation of the facts leading to my findings on summary judgment can be found in *Lyons I*.  I also rely on those facts here.
[5] *Id.* at *8.

to breach the employment agreement and come to work at GMG, where he could service the Book of Business.[6] Faced with this new testimony, GMG settled with the Plaintiff on the eve of the hearing, leaving Wilson alone in that Lyons' den. Wilson testified at the damages hearing, contrary to his earlier sworn testimony but consistent with the eleventh-hour affidavit, that he had conspired with the GMG principals to leave Lyons and come to GMG to service accounts that were part of the Book of Business, and further to lie about those facts in this action.[7]

In this Memorandum Opinion, I address damages for Wilson's breach of contract. I also consider Lyon's oral motion for fee shifting, under the bad faith exception to the American Rule under which each party is ordinarily responsible for its own legal fees. Lyons' counsel made perhaps the most cogent, and certainly the briefest, argument for fee shifting under the bad faith exception I have been privileged to hear: "perjury *is* bad faith."[8] True. Not only is perjury a criminal and immoral act, it is precisely inimical to the business of a court: the search for truth in way of doing justice. Moreover, had Wilson been truthful from the beginning of this litigation, its course would have been brief. Instead, Lyons has undergone a long and expensive litigation slog. Thus, both as incentive against perjury and,

---

[6] *See* Suppl. Aff. of Howard Wilson, Dkt. No. 183.
[7] Trial Tr. 21:4–25:20, Dkt. No. 188.
[8] Trial Tr. 36:21–36:22, Dkt. No. 188 (emphasis added).

independently, because it is required in the interest of justice, I grant Lyons' motion to shift fees.

A brief recitation of the background is followed by my reasoning, below.

## I. BACKGROUND[9]

*A. The Parties*

Plaintiff Lyons, a Delaware corporation, is an insurance broker with its principal place of business in Wilmington, Delaware.[10] Lyons' clientele includes commercial clients in Delaware, Pennsylvania, and elsewhere in the United States.[11]

Defendant Howard Wilson worked for Lyons as a risk advisor from July 2014 to August 2016.[12] Prior to joining Lyons, Mr. Wilson was employed in a similar role at USI.[13] Wilson began working at GMG on August 15, 2016, after leaving Lyons.[14]

---

[9] I recite the facts as I find them based upon the evidence submitted by the parties. To the extent there was conflicting evidence, I have weighed the evidence and made findings based on the preponderance of the evidence. In pursuit of brevity, I sometimes omit from this Background discussion testimony in conflict with the preponderance of the evidence. In such cases, I considered the conflicting testimony, and I rejected it. Citations to Joint Trial Exhibits ("JX") are expressed as JX __, at __. For clarity, certain citations to JXs reference the section number of a document (§) instead of the JX page. Citations in the form "Stip. ¶ __" refer to the Joint Pre-Trial Stipulation and Order.

[10] Stip. ¶ 1, Dkt. No. 172.

[11] Stip. ¶ 1.

[12] *See Lyons I* at *1; Stip. ¶ 3.

[13] Stip. ¶ 4.

[14] *Lyons I* at *2.

4

Defendant GMG is an insurance broker serving clients in Delaware, Pennsylvania, and elsewhere in the United States.[15]

*B. Relevant Facts*

### 1. Wilson Joins Lyons and USI Sues

Because the insurance business is based on personal relationships, insurance professionals such as Wilson are said to have a Book of Business consisting of their clients and prospective clients, often built up through considerable personal time and effort.[16] Prior to joining Lyons in 2014, while Wilson was at USI, the annual revenue of his Book of Business was over $500,000.[17] Much of that revenue was generated by his largest client, OTG Management, Inc. ("OTG").[18] When Wilson left his previous employer to join Lyons, approximately three-quarters of his Book of Business, including OTG, was willing to follow him.[19] In response, USI obtained an injunction from a Pennsylvania state court preventing Wilson from servicing his USI clients for two years (the "USI Injunction").[20] The clients who had followed Wilson were dispersed among other brokers.[21] Although Wilson's valuable Book

---

[15] *Id.*

[16] *See id.*

[17] *Id.* at *1–*2; Stip ¶¶ 7, 9.

[18] *See Lyons I* at *3. OTG generated approximately $350,000 to $400,000 in annual brokerage revenue. Stip. ¶ 8. Wilson's Book of Business at the time also encompassed several other accounts, including The Fruscione Company, LLC, Dandrea Masonry, Inc., and Delaware Quarries, Inc. *See, e.g., id.*

[19] *Lyons I* at *2.

[20] *Id.*

[21] *Id.*

of Business had been temporarily lost, Lyons paid for all of Wilson's expenses in the USI litigation and continued to employ him for two years.[22]

### 2. Wilson's Employment at Lyons

While employed with Lyons, Wilson was payed an annual salary of $205,000, a $50,000 signing bonus, life, health, and disability insurance, and contributions to a 401(k) plan.[23] This salary was based, at least in part, on the value of the Book of Business Wilson was supposed to have brought to Lyons from USI, but which was subject to the USI injunction.[24] At Lyons, Wilson's responsibilities included maintaining as much of a relationship with those clients as he could without violating the USI injunction.[25] Lyons had encouraged Wilson to help these clients select new brokers and, at Wilson's suggestion, some of his former clients went to GMG.[26] Wilson was also expected to cultivate relationships with potential new clients in order to bring business to the firm.[27] Lyons paid for Wilson to attend meetings in Las Vegas, the Bahamas, and elsewhere with his former clients and potential new clients.[28] Contrary to Lyons' and Wilson's prior expectations, Wilson generated no income from his Book of Business because of the USI injunction.[29] Furthermore,

---

[22] *See id.* at *2–*3.
[23] *Id.* at *2.
[24] *Id.*
[25] *Id.* at *3.
[26] *Id.* at *2.
[27] *Id.* at *3.
[28] *Id.*
[29] *Id.*

he generated only $30,000 to $40,000 in new business during his employment with Lyons.[30]

### 3. The Employment Agreement

When Wilson left USI, he signed an Employment Agreement with Lyons.[31] The Employment Agreement provided that in the event Wilson ever serviced his Book of Business at a competing company, he would owe Lyons 1.5 times the value of that Moved Business—"the annualized amount of commissions generated by that portion of the Book of Business" moved to the new employer, "to be determined by Lyons in its sole discretion."[32] The Employment Agreement also prohibited Wilson from engaging in competitive behavior, such as "impair[ing] or attempt[ing] to impair any relationship" between Lyons and its customers or prospective customers,[33] or any of Lyons' proprietary information.[34] These provisions would remain in effect for two years after Wilson's employment with Lyons was terminated.[35]

---

[30] *Id.*

[31] *Id.*; *see also generally* JX 2 (the Employment Agreement).

[32] *See* JX 2 §§ 3.3.5, § 4.1.

[33] JX 2 § 4.3; *see also* JX 2 §§ 3.2.5–3.2.6, § 3.3.2, § 4.2.

[34] *See* JX 2 § 2.

[35] *Lyons I* at *4; JX 2 § 4.1, § 4.3. Some of Lyons' obligations under the Employment Agreement, including those with respect to confidentiality, never terminate. *See, e.g.*, JX 2 § 2.

### 4. Wilson Leaves Lyons for GMG

As noted above, Wilson, with Lyons' knowledge and agreement, provided personal recommendations to several of his clients for brokers they might consider while the injunction prevented Lyons from soliciting or accepting their business.[36] GMG was one of the brokers Wilson recommended.[37] Wilson had a preexisting friendly relationship of many years with GMG's two principals and GMG had previously expressed interest in hiring him.[38] Wilson recommended GMG to OTG, his largest client, in the fall of 2015, after OTG expressed dissatisfaction with the previous broker Wilson suggested.[39] Around this time, a plan materialized between Wilson and GMG whereby Wilson would leave Lyons after the USI litigation concluded and join GMG to service his former clients.[40]

In 2016, Lyons paid USI $525,000 to settle the litigation.[41] The USI injunction was lifted and its non-competition requirements ended.[42] Shortly

---

[36] Stip ¶ 24.

[37] Trial Tr. 20:10–20:20.

[38] Stip ¶ 26.

[39] *Id.* ¶ 25.

[40] Trial Tr. 49:2-49:12; *see also* Stip ¶ 27 (noting that Wilson provided GMG with a copy of his employment agreement at Lyons in 2015); Suppl. Wilson Aff. ¶¶ 11–14, Dkt. No. 183 (listing meetings between Wilson, GMG's principals, and OTG's Chief Financial Officer, Joe Ozalas, at which OTG's account and Wilson's eventual employment with GMG were discussed).

[41] *Lyons I* at *3.

[42] *Id.*

thereafter, Wilson resigned from Lyons and began employment with GMG on August 15, 2016.[43]

As part of his employment at GMG, Wilson serviced clients that were previously part of his Book of Business at USI, but which were serviced by GMG following the USI injunction, including OTG.[44] The annual revenue of the moved clients was over $500,000.[45] In other words, these moved clients were the majority of Wilson's Book of Business.[46]

Wilson also hoped to be able to move some of Lyons' existing clients to GMG.[47] This effort was unsuccessful, however; Lyons declined to allow Wilson and GMG to buy out those clients, so they remained at Lyons.[48]

### 5. Lyons Brings Suit Against Wilson and GMG

Lyons initiated this action in 2017 seeking, among its other claims, preliminary injunctive relief and to hold Wilson liable for breaching the Employment Agreement.[49] After denying Lyons' request for a preliminary injunction, I heard oral argument on the parties' cross-motions for summary

---

[43] *Id.*

[44] *Id.* Evidently, OTG was pleased with the service it received at GMG, including that a GMG account executive saved OTG approximately $1 million by discovering an error that Wilson overlooked. Trial Tr. 23:6–23:23.

[45] *Lyons I* at *3. The gross revenue on Wilson's Book of Business in 2017 was $7,105,659.78. JX 33.

[46] In 2017, Wilson's commissions from OTG alone were over $200,000. *Id.*

[47] *Lyons I* at *3.

[48] *Id.*

[49] *Id.* at *4.

judgment on June 11, 2018, at which time the parties agreed that there were no genuine issues of material fact.[50] I issued a Memorandum Opinion on September 28, 2018 finding that by servicing clients that would likely have been at Lyons but for the USI injunction, Wilson impaired Lyons' relationships with those prospective clients in violation of the Employment Agreement.[51] I directed the parties to confer regarding the remaining issues and appropriate remedy.[52] After an unsuccessful attempt to mediate, the parties proceeded to a trial on December 10, 2020.[53]

### 6. Wilson has a Change of Heart and GMG Settles

Shortly before trial, Wilson recanted his prior testimony as perjurious.[54] He admitted that he had plotted with GMG principals to breach the Employment Agreement and come to work at GMG, where he could service the former clients that had moved there.[55] A few hours later, Lyons and GMG informed the Court that they had reached an agreement in principle to settle the claims between them.[56] Thus, the trial was limited to determining the extent to which Lyons was damaged by Wilson's conduct.

---

[50] *See id.* at *5.
[51] *Id.* at *6–*8. I granted the Defendants' Motion for Summary Judgment with respect to allegations of aiding and abetting, unjust enrichment, and civil conspiracy, and denied Summary Judgment as to tortious interference. *Id.*
[52] *Id.* at *10.
[53] *See, e.g.*, Ltr. to Counsel Confirming Trial, Dkt. No. 161.
[54] *See* Suppl. Wilson Aff., Dkt. No. 183.
[55] *E.g., id.* ¶ 11. Per Wilson, this plan was first conceived over breakfast in early 2016 and culminated with a lunch sometime in May of that year. *See id.* ¶¶ 11–14.
[56] *See* Ltr. re Partial Settlement, Dkt. No. 185.

Wilson testified at the damages hearing—contrary to his earlier sworn testimony but consistent with his affidavit—that he had conspired with GMG to leave Lyons to service his Book of Business at GMG, and further to lie about those facts in this action.[57]

*C. Procedural History*

At trial on December 10, 2020, the Plaintiff presented its evidence of damages and made a post-trial oral application for fee-shifting.[58] Wilson responded in writing on January 7, 2021.[59] The Plaintiff submitted its reply on January 14, 2021 and I consider the matter submitted for decision as of that date.[60]

## II. ANALYSIS

Having already found that Wilson breached the Employment Agreement, all that remains is for me to determine the appropriate quantum of damages. Lyons has posited two different measures of damages: (1) liquidated damages pursuant to Section 4.1 of Wilson's Employment Agreement; and (2) rescissory damages.[61] Lyons also requested that 50% of its legal fees should be shifted to Wilson under the

---

[57] *E.g.*, Trial Tr. 21:4–25:20, Dkt. No. 188. He also testified that, while still employed by GMG, he felt pressure from the principals there to "stick to the [original, false] story" that there had been no such plan throughout this litigation. Trial Tr. 23:24–24:18. After being let go from GMG, Wilson wanted to "set the record straight," clear his conscience, and "let the chips fall where they may." *Id.* 25:18–25:20.

[58] *See generally* Trial Tr.

[59] Def.'s Post-Trial Opp'n Br., Dkt. No. 189.

[60] Pl.'s Post-Trial Reply Br., Dkt. No. 191.

[61] Trial Tr. 56:16-61:15; Pl.'s Post-Trial Reply Br. ¶ 7.

11

bad-faith exception to the American Rule.[62] Because the buyout provision provides an adequate legal remedy for Wilson's breach of the employment agreement, I adopt that metric. In light of Wilson's perjurious pre-trial conduct, I also find Wilson responsible for 50% of Lyons' fees in this litigation.

The buyout provision of Section 4.1 of Wilson's Employment Agreement provided that in the event of Moved Business, Wilson was to pay Lyons "an amount equal to 1.5 times the Moved Business."[63] Throughout the majority of this litigation, the Plaintiff sought damages based on Section 4.1. This Court may enforce liquidated damages clauses where they "reasonably relate to an actual anticipated loss caused by the employee's anti-contractual competition."[64] As part of my previous ruling, I found the buyout provision in the Employment Agreement valid and enforceable.[65] I requested guidance, however, as to the amount of damages required by the buyout provision in this scenario: where some of the clients Wilson serviced at GMG, including OTG, initially moved as a result of the USI injunction, rather than as a result of Wilson's anti-competitive behavior.[66] At trial, Lyons proffered a damages calculation based on the buyout provision, applying that

[62] Trial Tr. 56:20–57:12.
[63] JX 2 § 4.1.
[64] *Lyons Ins. Agency, Inc. v. Wark*, 2020 WL 429114, at *1 (Del. Ch. Jan. 28, 2020).
[65] *Lyons I,* 2018 WL 4677606, at *9 (Del. Ch. Sept. 28, 2018).
[66] In fact, as noted above, some of them moved at Lyons' behest.

formula to the clients from Wilson's Book of Business that he serviced at GMG. That amount, which was not contested by Wilson, is $1,011,541.[67]

Wilson objects that these damages lack sufficient proximity to the breach to be appropriate. He argues that Lyons must prove that but for the breach, OTG and the other Book of Business entities would have been Lyons' customers.[68] But that is not how the buyout provision of the contract is structured. OTG, as well as other customers, comprised Wilson's Book of Business, for which he was hired by Lyons. Wilson caused some of these customers, principally OTG, to move to GMG.[69] He then secretly agreed with GMG to become employed by GMG to service these accounts, once Lyons was able to terminate the litigation with his former employer at considerable expense to Lyons, making Wilson's scheme possible. I find it reasonable to treat these clients as Moved Business for the computation of damages.[70]

---

[67] *See, e.g.*, Trial Tr. 59:22–60:11; Pl.'s Post-Trial Reply Br. 7, 7 n.11.
[68] Def.'s Damages Opp'n Br. ¶ 6, Dkt. No. 189.
[69] I previously found that these clients constituted prospective customers of Lyons at the time Wilson moved to Lyons from USI and thus were a part of the contractually protected Book of Business. *See Lyons I* at *7.
[70] Although I acknowledge that Lyons' prospective customers do not perfectly conform to the definition of Moved Business in the Employment Agreement, I find this method reasonable. In other words, to the extent that it is unclear how damages should be computed in strict compliance with the liquidated damages clause, I adopt the "1.5 times the Moved Business" rubric, agreed to by the parties, as the metric for common-law damages.

Wilson also argues that damages be denied due to Lyons' unclean hands.[71] After all, he reasons, Lyons interfered with his contract with USG, causing Wilson himself to breach, and thus equity should be closed to Lyons' request for redress for Wilson's breach of its own employment agreement with him.

Wilson, in my view, misapprehends the doctrine of unclean hands. The doctrine protects the reputation of this court of equity, by preventing litigants who have themselves acted inequitably with respect to the issues in litigation from invoking the puissance of equity in aid of their turpitude.[72] The fact that the plaintiff here was involved in a prior breach of a separate contract is no bar to its recovery of damages—legal, not equitable, relief—in this litigation.

In its post-trial oral application, Lyons asked that I eschew contractual liquidated damages and instead award damages based on unjust enrichment/rescission to repay Lyons for its investment in Wilson, which, in light of Wilson's new testimony, it feels Wilson wrongfully received.[73] The parties negotiated for the contingency of Wilson leaving to a competitor, however. Considering Lyons' dealings in hiring Wilson away from his previous employer, his lack of commitment to Lyons should have come as no surprise. As detailed further

---

[71] *E.g.*, Def.'s Damages Opp'n Br. ¶ 7.

[72] *See, e.g.*, *In re the Niki and Darren Irrevocable Trust*, 2020 WL 8421676, *1 (Del. Ch. Feb. 4, 2020).

[73] That amount, which is derived based on Wilson's salary at Lyons as well as what Lyons paid to settle the USI litigation, is approximately $1,335,000.

below, I agree that Wilson's conduct in this litigation has been egregious. While I find that fee shifting is warranted by Wilson's bad faith in the litigation, that bad faith does not inform my calculation of damages for breach of contract, which is the wrong I seek to remedy here. The Employment Agreement provides a method for calculating damages in the event of a breach: 1.5 times the Moved Business. That is what Lyons agreed to, and that is what they must get.

The contractual formula will determine the amount of damages here. Lyons has suggested, and Wilson has not contested, that $1,011,541 represents 1.5 times the value of the Moved Business.[74] I am not able to reproduce this calculation based on the record, however. I request an appropriate form of order as to the quantum of contract damages, below.

Lyons has also requested that Wilson be responsible for 50% of its legal fees in this action, under the bad faith exception to the American Rule.[75] Its application was brief: "perjury is bad faith per se."[76] I agree. While I am aware that Wilson ultimately came clean, his perjurious pre-trial conduct unreasonably delayed resolution of this action and wasted the resources of the litigants and this Court. He thus acted in bad faith throughout this litigation.[77]

---

[74] *See, e.g.*, Trial Tr. 60:4–60:12; Pl.'s Post-Trial Reply Br. 6–7, 7 n.11.
[75] *See* Tr. 56:20–57:12.
[76] *See* Trial Tr. 36:19–36:22.
[77] *See Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *22 (Del. Ch. Sept. 10, 2018) (noting that bad faith includes unnecessarily prolonging or delaying litigation, misleading the court, altering testimony, changing position on an issue, and perjury).

15

Wilson argues strenuously against fee shifting.[78]  He acknowledges his perjury; nonetheless he portrays himself as a hapless creature overborne by the will of others, finally undone by GMG's "all-too-good offer"[79] and its principals' suggestion that he testify falsely.  Like Adam and Eve, he was importuned by the serpent; like Jack Woltz, the Godfather made him an offer he could not refuse.  Wilson sells himself short.  This brief Memorandum Opinion is no place for a discussion of free will, but I note that our system of justice relies on the understanding that competent individuals are moral actors making choices for which they are responsible.  I will not depart from this assumption here.

This Court follows the American Rule, under which each party bears its own fees.[80]  An exception applies, however, where bad faith in the litigation provokes equity to act to relieve the victim of that bad faith and to protect the integrity of the judicial process.[81]  That exception is applicable here, warranting fee shifting.[82]  Had Wilson been honest initially, Lyons would have avoided its litigation expense, with the potential exception of this damages inquiry.  As Lyons recognizes, Wilson was

---

[78] *See* Def.'s Damages Br. ¶¶ 12–20.
[79] *Id.* ¶ 19.
[80] *See, e.g.*, *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850 (Del. Ch. 2005) ("Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees, which, in equity, may be awarded at the discretion of the court.").
[81] *See, e.g.*, *id.* at 850–51; *Trascent Mgmt. Consulting*, 2018 WL 4293359, at *21–*22 (collecting cases).
[82] *See, e.g.*, *Trascent Mgmt. Consulting*, 2018 WL 4293359, at *22.

16

but one of two defendants; accordingly, I grant their request to shift one-half of their reasonable fees here. I exclude fees incurred after I issued *Lyons I*, however, in recognition that a good-faith disagreement concerning damages might have led to litigation expense even absent Wilson's bad acts.

## III. CONCLUSION

I award damages to Lyons in the amount of 1.5 times the Moved Business, together with prejudgment interest from the time of the breach. The parties should consult; if they can agree on the appropriate quantum of damages, they should provide it in a form of final order. If they cannot, I will convene a brief damages inquiry. I also award Lyons 50% of its reasonable legal fees for this action, through *Lyons I*. Lyons should file an affidavit of fees, and the parties should provide for that in the form of order as well.